**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**

DEMOCRATIC SENATORIAL CAMPAIGN COMMITTEE, and BILL NELSON FOR U.S. SENATE,

Plaintiffs,

v.

KENNETH W. DETZNER, in his official capacity as Florida Secretary of State, the FLORIDA ELECTIONS CANVASSING COMMISSION, and RICK SCOTT, PAMELA BONDI, and JIMMY PATRONIS, in their official capacity as members of the Florida Elections Canvassing Commission,

Defendants.

Case No.4:18-cv-00528-MW-MJF

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Democratic Senatorial Campaign Committee and Bill Nelson for U.S. Senate (collectively, "Plaintiffs") respectfully submit the following memorandum of law in support of their emergency motion for a temporary restraining order and preliminary injunction.

## INTRODUCTION

The administration of elections in Florida has been in the national spotlight before. As the 2018 election continues, the nation's eyes have turned to Florida again. The integrity of the process has been under attack from the outset, with serious concerns being raised about whether all votes properly cast will be counted, and partisans alleging that those concerns amount to an attempt to "steal" the election. When people lose faith in the integrity of the election process, faith in democracy itself is undermined.

It is in that context that the present lawsuit is filed. The 2018 election has been hard fought. The candidates for U.S. Senator are currently separated by a mere .15% of the more than 8 million votes cast. Election officials have been working around the clock to count the votes. They are simultaneously conducting three statewide recounts and, in some cases, recounts for local offices as well. The problem here is that it has become apparent that absent relief from this Court, not every properly cast vote will be counted.

Florida law requires each county canvassing board to certify that the election returns filed with the Department of State include "*all valid votes cast in the election*." Fla. Stat. § 102.112(1) (emphasis added). This is not just a statutory mandate, but also a constitutional prerogative: "It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote

and *to have their votes counted*. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (emphasis added). But where a recount is triggered in a given race, Florida law creates the risk that administrative deadlines will be prioritized over the constitutional right to vote. Under Florida law, no matter how many ballots are to be counted, no matter the number of races to be recounted, and no matter the technological limitations and logistical realities, any mandated machine and manual recounts *must* be completed "by noon on the 12th day following the general election." *Id.* § 102.112(2). "Valid votes cast" by eligible voters in Florida will *not* be counted if the county in which they happen to reside is unable to meet this deadline. Rather, lawfully-cast votes that would be counted in the course of a recount "shall be ignored" if a county is unable to complete the recount by this arbitrary deadline. *Id.* § 102.112(3).

It has become apparent that despite the concerted efforts of local officials, in some cases it simply may not be possible to meet this deadline. Accordingly, Plaintiffs challenge the enforcement of Florida's recount deadlines where, as here, they threaten to disenfranchise voters who would have their votes counted but for their county's inability to perform the mandated recount procedures in less than two weeks after the general election. Where, as here, a state law—and its disparate impact on similarly situated voters—burdens the constitutional right to vote, any state interest in enforcing administrative deadlines must give way.

Plaintiffs therefore respectfully ask the Court to enjoin Defendants from refusing to accept the results of the state-mandated machine recount and any state-ordered manual recount, and from certifying the election results until such recounts are completed.

## STATEMENT OF FACTS

On November 6, 2018, Florida held a general election. Among other races on the ballot was the office of U.S. Senator. The Democratic candidate is Senator Bill Nelson; the Republican candidate is Governor Rick Scott. Well more than 8 million votes were cast for U.S. Senator.

Under Florida law, local canvassing officials must report election results "no later than noon on the fourth day after any general or other election." Fla. Stat. § 102.147(5). These returns are, however, "unofficial." *Id.* This is because the original, "unofficial" returns invariably do not include every vote validly cast in the election. Original, unofficial results *do* often contain counting errors in the initial canvass of votes. Original, unofficial results do *not* include validly cast votes that are rejected because of voting machine error, such as failure of the machine to read a voter's marking of the ballot correctly.

In recognition of this issue, Florida law provides for a recount process to address and correct voting machine errors when the results of a close election hang in the balance. The problem presented here is that Florida has adopted

arbitrary, accelerated deadlines for completing the recount process that in some cases cannot actually be met, and enforcement of those deadlines will likely result in discarding the lawfully cast votes of tens of thousands of Florida voters.

### A. Florida's Recount Process

In the closest elections, a two-part recount process is called for to ensure that all votes validly cast are counted and no Floridian is disenfranchised through no fault of his or her own.

#### 1. Machine Recount

The first step in the process is a machine recount. If the "unofficial" returns filed by the county canvassing boards by the fourth day after the election (here, Saturday, November 10, 2018) reflect that a candidate lost by one-half percent or less of the votes cast for the office, "a recount shall be ordered of the votes cast with respect to such office." Fla. Stat. § 102.141(7).

Some counties use touchscreen ballots, while others use automatic tabulating equipment. The specific way a machine recount proceeds depends on the kind of technology used. Fla. Stat. § 102.141(7)(a); Fla Admin Code r. 1S-2.031(4)(e)(1).

Of critical importance here, in jurisdictions where automatic tabulating machines are used, some ballots validly cast by voters are not counted in the machine recount. First, where a ballot has been physically damaged such that it

cannot be counted using the automatic tabulating equipment during the recount, a duplicate ballot is made. Fla. Stat. § 102.141(7)(a). Second, where the automatic tabulating equipment detects more than one vote for a given office (an "overvote") or no vote for a given office (an "undervote"), those ballots are simply set aside—to be ignored unless a manual recount occurs. Fla. Admin Code r. 1S-2.031(4)(b)(3), (c)(3); Fla. Stat. § 102.166(1), (2)(b). Only in a manual recount will the votes improperly rejected as overvotes or undervotes be counted.

A canvassing board required to conduct a machine recount must file a second set of unofficial returns reflecting the result of the recount no later than 3 pm on the 9th day after the election (here, Thursday, November 15). Fla. Stat. § 102.141(7)(c).

**2. Manual Recount**

If the second set of unofficial returns—those following a machine recount—indicate that a candidate lost by one-quarter of a percent or less of the votes cast for the office, "a manual recount of the overvotes and undervotes cast in the entire geographic jurisdiction of such office" must be ordered by the Secretary of State—but only if certain conditions are met. Fla. Stat. § 102.166(1). Specifically, a manual recount is *not* ordered unless "[t]he number of overvotes and undervotes is fewer than the number of votes needed to change

the outcome of the election." *Id.* § 102.166(1). In short, the very premise of a manual recount is that the results of the election may ride on counting additional ballots.

The purpose of the manual recount is twofold. First, with regard to jurisdictions using automatic tabulation equipment, overvotes and undervotes are reviewed to determine if the voter in fact "made a definite choice for" a given office following the standards set out in Florida law. Fla. Stat. § 102.166(5)(b); Fla. Admin Code r. 1S-2.031(5)(c)(3). Similar procedures govern the manual recount in jurisdictions using touchscreen ballot technology, which does not permit the possibility of overvotes, but which may generate undervotes that must be reviewed during a manual recount. Fla. Admin. Code r. 1S-2.031(5)(e)(1).

Second, where it was necessary to create a duplicate ballot during the machine recount, the duplicate is compared to the original "to ensure the correctness of the duplicate." Fla. Stat. § 102.166(5)(b). This guards against the possibility that election officials may have made inadvertent errors in filling out a duplicate ballot.

Under Florida law, the manual recount does not necessarily proceed until it is finished. Rather, Florida requires each county canvassing board to submit official returns no later than noon on the 12th day following the election (here,

Sunday, November 18). Fla. Stat. § 102.112(2). By this deadline, county canvassing boards are duty bound to certify that they have "compared the number of persons who voted with the number of ballots counted and that the certification includes all valid votes cast in the election." *Id.* § 102.112(1).

Where a county canvassing board remains in the midst of a manual recount, it cannot truthfully make such a certification. Florida's "solution" appears to be to disenfranchise voters whose votes remain uncounted in the name of administrative convenience. Rather than defer the certification deadline until the completion of the recount, the Department of State is instead compelled to "ignore" a county's returns and use whatever returns it then has on file for that county. Fla. Stat. § 102.112(3). In other words, the Department of State must pretend that the manual recount was not in process and disregard the valid votes identified and counted for the first time in that manual recount.

### B. The Senate Race is Heading for a Manual Recount Given the Razor Thin Margin

Every properly cast vote should be counted. Always. But the constitutional imperative of safeguarding the right to vote becomes all the more critical when a close election hangs in the balance.

The Secretary of State has declared a machine recount for three statewide elections (U.S. Senator, Governor, and Agriculture Commissioner).[1] In addition, some local races have gone to a machine recount, such as State House District 89 in Palm Beach County.[2]

As of the date of this filing, the margin in the U.S. Senate race is a mere .15% (12,562 votes)—well within the margin triggering a manual recount.[3] The Secretary of State is expected to order that a manual recount will be conducted because the number of overvotes and undervotes will exceed the margin between the two top candidates for the U.S. Senate. For example, one news report states that a manual recount "is all but a certainty" and suggests that there could be more than 125,000 overvotes and undervotes in the Senate race.[4]

Simply put, the Senate election is almost certain to turn on the disposition of votes that have not yet been counted.

[1] David Smiley & Douglas Hanks, *State Orders Recount of More than 8 Million Ballots in Senate, Governor, Cabinet Races*, MIAMI HERALD (Nov. 10, 2018), https://www.miamiherald.com/news/politics-government/election/article221468340.html.
[2] Lulu Ramadan, *Florida Election Recount: Trailing by 37 Votes, Democratic House 89 Candidate Sues*, PALM BEACH POST (Nov. 12, 2018), https://www.palmbeachpost.com/news/20181112/florida-election-recount-trailing-by-37-votes-democratic-house-89-candidate-sues.
[3] Caitlin Ostroff & Zachary T. Sampson, *Florida May Have Two Manual Recounts. Here's How it Works and What's To Be Counted*, Miami Herald (Nov. 12, 2018), https://www.miamiherald.com/news/politics-government/state-politics/article221557280.html.
[4] *Id.*

### C. At Least One Florida County Likely Will Be Unable to Complete a Machine and Manual Recount for Four Races, Including the Senate Race, in a Matter of Days

The simple problem here is that, in some counties, there are too many ballots to count given technological limitations in too short a time. The deadlines set out in Florida law are extraordinarily compressed. Given that, along with the large number of races currently subject to machine recount, local election officials are faced with a Herculean task. Press reports are rife with the challenges faced by election officials in various counties in conducting a recount of large numbers of ballots in a very short period of time. For example, a series of technical issues in Broward County delayed the recount of more than 700,000 ballots from even starting.[5]

Indeed, officials in one of Florida's largest counties—Palm Beach—have indicated that it may be impossible to complete a machine recount for all outstanding races by the deadline of Thursday at 3 p.m. Because of limitations in technology available—including a limited number of automatic tabulation machines—Palm Beach County can only recount one race at a time.[6] In its unofficial election returns, Palm Beach reported that the top two candidates—

---

[5] Glenn Garvin & Alex Harris, *Machine Glitches delay the start of ballot recount in Broward County by hours*, MIAMI HERALD (Nov. 11, 2018), https://www.miamiherald.com/news/local/community/broward/article221501750.html.

[6] Jillian Idle & Stephanie Susskind, *Palm Beach County Supervisor of Elections Susan Bucher Blames Technology for Recount Concerns*, WPTV (Nov. 12, 2018), https://www.wptv.com/news/region-c-palm-beach-county/west-palm-beach/bucher-blames-technology-for-recount-concerns.

Governor Scott and Senator Nelson—received a combined 585,117 votes, all of which must be re-run through the voting machines. Even if Palm Beach County is able to finish the machine recount of the Senate race, Supervisor of Elections Susan Bucher has suggested that Palm Beach County will not be able to recount hundreds of thousands of ballots four separate times so as to complete the machine count of all four races.[7]

Based on concerns expressed by elections officials regarding the pace of the machine recount, in at least Palm Beach County, it appears that the manual recount will not be completed by the Sunday at noon deadline. Meanwhile in Broward County, it appears that there may be roughly 25,000 undervotes,[8] raising questions about whether it is humanly possible to assess every undervote and overvote in the 69 hours between the deadlines for completing the machine and manual recounts.

In short, while the situation remains fluid as local election officials scramble to meet the impending deadlines, it is becoming apparent that some counties will likely be unable to complete the entire recount process. As a result,

---

[7] Lulu Ramadan, *Florida Election Recount: Trailing by 37 Votes, Democratic House 89 Candidate Sues*, PALM BEACH POST (Nov. 12, 2018), https://www.palmbeachpost.com/news/20181112/florida-election-recount-trailing-by-37-votes-democratic-house-89-candidate-sues.

[8] John McCarthy, Senate recount: Broward undervotes likely to be key in deciding winner, FLORIDA TODAY (Nov. 10, 2018) (noting that the initial count reflects roughly 25,000 fewer votes cast for Senator than Governor), https://www.floridatoday.com/story/news/politics/elections/2018/11/10/florida-senate-recount-updates-results-broward-scott-nelson-gillum/1956447002/.

valid votes cast by Floridians for the office of U.S. Senator which were improperly rejected as "overvotes" or "undervotes" will not be counted and these voters will be disenfranchised through no fault of their own.

### D. The Statutory Deadlines by which Each Step of the Recount Process Must Be Completed Are Arbitrary

Critically, there is nothing magic about either the Thursday deadline for completion of machine recounts or the Sunday deadline for all election returns. Candidates elected to the U.S. Senate will not be seated until January 3, 2019, *see* 2 U.S.C. § 1, more than *six weeks* after the November 18, 2018 deadline for election returns imposed by Florida statute, Fla. Stat. § 102.112(2). Thus, while Plaintiffs and Florida voters will suffer grievous constitutional injury from a short-circuited recount, the State gains nothing by wrapping up the recount process before every last vote is counted.

## ARGUMENT

**The recount deadlines imposed by Fla. Stat. §§ 102.141(7)(c) and 102.112(3) threaten the outright rejection of validly cast votes for U.S. Senate that—but for a county's inability to recount fast enough—would have been counted in the final election returns. Enforcement of those deadlines at the expense of a full and fair recount of "all valid votes cast in the election,"** ***id.*** **§ 102.112(1), is unconstitutional and should be enjoined immediately.**

### A. Temporary restraining order and preliminary injunction standard

"A party seeking a preliminary injunction bears the burden of establishing its entitlement to relief." *Scott v. Roberts*, 612 F.3d 1279, 1289-90 (11th Cir. 2010). "To obtain such relief, the moving party must show (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable injury unless the injunction is issued; (3) that the threatened injury outweighs possible harm that the injunction may cause the opposing party; and (4) that the injunction would not disserve the public interest." *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015); *see also United States v. Florida*, 870 F. Supp. 2d 1346, 1348 (N.D. Fla. 2012) (same standard for obtaining temporary restraining order). Here, Plaintiffs have met each of these factors and are thus entitled to the temporary injunctive relief that they seek.

### B. Plaintiffs are Likely to Succeed on the Merits

The State's refusal to count votes cast by eligible Florida voters who—but for their county's inability to comply with the statutory deadline—would have their votes counted in a given race threatens to arbitrarily disenfranchise voters and impose a severe burden on the right to vote, in violation of the First and Fourteenth Amendments.

**1. The Recount Deadlines Impose an Undue Burden on the Right to Vote**

In *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), the Supreme Court laid out a "flexible standard" to resolve constitutional challenges to state election laws that burden voting rights. *See Anderson*, 460 U.S. at 789. "A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 433-34 (quotation marks and citation omitted). When a regulation subjects the right to vote to a "severe" restriction, the restriction "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992). Less severe burdens remain subject to balancing. But "[h]owever slight" the burden on the right to vote "may appear," "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality) (quoting *Norman*, 502 U.S. at 288-89).

Courts have held that a denial of the right to vote clearly amounts to a severe burden on the franchise. *See, e.g.*, *Fla. Democratic Party v. Scott*, 215 F.

Supp. 3d 1250, 1257 (N.D. Fla. 2016) (holding that "because Florida's statutory [voter registration deadline] framework would categorically deny the right to vote to those individuals [displaced by a hurricane], it is a severe burden that is subject to strict scrutiny") (citing *Burdick*, 504 U.S. 434); *see also Ayers-Schaffner v. DiStefano*, 860 F. Supp. 918, 921 (D.R.I. 1994), *aff'd*, 37 F.3d 726 (1st Cir. 1994) ("A complete denial of the right to vote is a restriction of the severest kind."); *Ne. Ohio Coal. For Homeless v. Husted*, 696 F.3d 580, 585-87 (6th Cir. 2012) ("summary" and "automatic" nature of disqualification of right-place, wrong-precinct ballots suggests burden on right to vote is "substantial"); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015) ("*LOWV*") ("[T]he basic truth [is] that even one disenfranchised voter—let alone several thousand—is too many[.]").

Because denial of the right to vote imposes a severe burden on the franchise, courts routinely hold that administrative election deadlines must yield to voters' "constitutionally protected right to vote and to have their votes counted." *Reynolds*, 377 U.S. at 554. For example, in *Florida Democratic Party v. Scott*, this Court ordered emergency injunctive relief extending the voter-registration deadline after a hurricane displaced potential voters during the period of registration. 215 F. Supp. 3d at 1257. The Court emphasized that

enforcement of the registration deadline imposed a "severe burden" on and "would categorically deny the right to vote" to thousands of individuals and found it "nonsensical to prioritize those deadlines over the right to vote." *Id.* at 1257-58 (citation omitted).

Other courts have likewise held that election deadlines must give way to ensure that voters have sufficient time both to vote and to have their validly cast votes counted. *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 435 (6th Cir. 2012) ("*OFA*") (affirming injunction prohibiting state officials from enforcing statute limiting the period of early in-person voting for nonmilitary voters because "the State has not shown that it would be burdensome to extend early voting to all voters"); *Ga. Coal. for the Peoples' Agenda, Inc.*, 214 F. Supp. 3d 1344, 1345 (S.D. Ga. 2016) (granting preliminary injunction extending the voter-registration deadline because potential voters had been displaced by a hurricane and government officials agreed that "an individual's loss of the right to vote is clearly an irreparable injury that outweighs any damage caused by extending the deadline"); *Doe v. Walker*, 746 F. Supp. 2d 667 (D. Md. 2010) (entering injunction extending deadline for receipt and counting of ballots from overseas voters because the administrative deadline imposed a severe burden on the fundamental right to vote and the State had "not articulated a single, specific injury that would result from extending the deadline"); *In re Holmes*, 788 A.2d

291, 295 (N.J. Sup. Ct. 2010) ("[R]igid application of the rule that all ballots be received by the board by 8:00 P.M. of Election Day would unfairly deprive absentee voters of their franchise as a result of exceptional circumstances neither within their control nor which, in light of human experience, might reasonably be expected.").

Here, moreover, the magnitude of the burden is only amplified by the critical nature of the votes at stake. Under Florida law, those votes subject to recount are likely to be outcome determinative. Where the results of the machine recount indicate that a candidate was defeated by a quarter percent or less of the votes cast for that office, "a manual recount of the overvotes and undervotes cast in the entire geographic jurisdiction of such office . . . shall be ordered *unless* . . . [t]he number of overvotes and undervotes is fewer than the number of votes needed to change the outcome of the election." Fla. Stat. § 102.166(1)(b) (emphasis added). In other words, an election proceeds to manual recount only if those votes that should have been but were not counted in the initial canvas could have a dispositive impact. Where those votes that could decide the outcome of an election are rejected simply because a given county is unable to tally them up within twelve days, the injury to voters is all the more severe.[9]

[9] The magnitude of the burden is further amplified by the sheer number of recounts taking place across the state. As of this filing, three statewide contests—for U.S. Senate, Governor, and Agricultural Commissioner—are under recount. *See supra* n.1. Plaintiffs are aware of at

### 2. The Recount Deadlines Will Treat Similarly Situated Voters Differently—Resulting in the Disenfranchisement of Some and Not Others

Nor is this burden shared equally among all Floridians. Rather, voters fortunate enough to live in counties in which the canvassing boards are able to complete the recount on time will have their votes counted, while voters in other counties will have their votes "ignored," Fla. Stat. § 102.112(3).

"A citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *OFA*, 697 F.3d at 428 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)); *accord Obama for Am. v. Husted*, 888 F. Supp. 2d 897, 905 (E.D. Ohio 2012) ("The . . . Supreme Court has reiterated time and again the particular importance of treating voters equally . . . .") (citing cases). "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, *the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another*." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000) (emphasis added).

---

least one other local race in which a recount has been triggered. *See supra* n.2. The fact that multiple races are subject to recount at once decreases the likelihood that all of them will be completed by the statutory deadlines and increases the number of voters across the state who run the risk of having their votes discarded for no other reason than the arbitrary recount deadlines.

In the ballot-counting context, equal protection means that recount procedures must be consistent with the obligation to avoid arbitrary and disparate treatment of voters and prevent the unequal evaluation of votes cast for the same office. *Id.* at 105–06. Indeed, where ballots are counted in arbitrary and disparate ways, courts have found a violation of the Equal Protection Clause or that plaintiffs are likely to succeed on the merits of an equal protection claim. *See, e.g.*, *id.* at 110–11 (recount procedure in which standards for accepting or rejecting contested ballots varied from county to county violated Equal Protection Clause); *Ne. Ohio Coal. for Homeless*, 696 F.3d 580 (different treatment of similarly situated provisional ballots likely violates Equal Protection Clause); *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219 (6th Cir. 2011) (using inconsistent standards when counting provisional ballots likely violates Equal Protection Clause).[10]

Similarly here, where the right to have one's vote counted is contingent upon the county in which a voter resides, equal protection principles mandate that the administrative deadline by which some votes are counted and others are "ignored" must give way. *See Fla. St. Conf. of NAACP v. Browning*, 522 F.3d 1153, 1185-86 (11th Cir. 2008) (finding violation of Equal Protection Clause

[10] Equal Protection Clause challenges are evaluated under the flexible standard of the *Anderson-Burdick* test. *See Hunter*, 635 F.3d at 238 (applying *Anderson-Burdick* balancing in equal protection challenge).

where voter identification number matching scheme "results in the arbitrary and disparate treatment of citizens based on county of residence"); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (allegations of numerous problems encountered by voters when casting ballots could establish that voting system burdens the right to vote "depending on where voters live," in violation of Equal Protection Clause).

### 3. The State Can Proffer No Compelling Interest Justifying the Disenfranchisement of Innocent Voters

The burdens imposed by the recount deadlines cannot be justified by any legitimate, much less compelling, state interest. Indeed, in the context of the statewide races under recount in Florida, those deadlines are entirely arbitrary.

There is no federal law or federal interest compelling Florida's county canvassing boards to certify their election results by noon on November 18. Simply put, not meeting the November 18 will work no injury on the State of Florida.

There are circumstances where state interests support prompt deadlines. For example, such an interest may exist in a presidential election where federal law requires states to resolve all disputes around electors to the electoral college at least six days prior to the meeting of and voting by electors. *See* 3 U.S.C. §§ 5, 7; *Bush v. Gore*, 531 U.S. at 110 ("That statute . . . requires that any controversy or contest that is designed to lead to a conclusive selection of

electors be completed by December 12. That date is upon us[.]"). But there is no such requirement for a United States Senator. The only conceivable federal law implicated by the completion of a Senator's election is 2 U.S.C. § 1, which provides that Senators shall be elected to a "term commencing on the 3d day of January next thereafter."[11] But January 3rd is over six weeks after the November 18 election returns deadline imposed by Florida statute. Rest assured, there is enough time for Florida to comply with its recount procedures and count every vote.

Indeed, if there were some overarching reason why it would be necessary to have all recounts completed by the 12th day following an election, one would expect all states to have adopted the same deadline. They have not. Any purported necessity for Florida to cut off any and all recounts that are still incomplete by the upcoming deadlines is belied by the statutory deadlines—or lack thereof—of numerous other states to report recount results. *See, e.g.*, Cal. Elec. Code § 15626 (recount "shall be continued daily, Saturdays, Sundays, and holidays excepted, for not less than six hours each day until completed"); Ky. Rev. Stat. § 120.185(1) (court "complete[s] the recount as soon as practicable"); Col. Rev. Stat. § 1-10.5-102(2) ("The recount shall be completed no later than

[11] Even this argument fails in the real world where nine of the past 12 Congresses began on a date after January 3. Michael L. Koempel & Judy Schneider, *The First Day of a New Congress: A Guide to Proceedings on the Senate Floor*, 1 (2017). And, there is no requirement that a Senator be seated on the first day of the new term.

the thirty-fifth day after any election."); Neb. Rev. Stat. § 32-1118(4) ("Secretary of state shall, on or before December 20, certify the results of the recount."). The fact that many other states manage to have later deadlines for election returns—or no deadlines at all—and still seat senators in Congress indicates that Florida's decision to tie the Secretary's hands to the November 15 and November 18 deadlines is entirely arbitrary.

In fact, even Florida recognizes that there are circumstances which require an extension of its certification deadlines. Specifically, the statutory scheme already allows for an extension of the deadlines in the event of certain "emergenc[ies]." Fla. Stat. § 102.112(4).[12] Regardless of whether the current circumstances qualify as an "emergency" under state law, there is no question the statutory scheme recognizes the need for election returns deadlines to give way where circumstances outside the voters' control preclude the deadline from being met. *Cf. Fla. Democratic Party*, 215 F. Supp. 3d at 1257 ("[I]t is wholly irrational in this instance for Florida to refuse to extend the voter registration deadline when the state already allows the Governor to suspend or move the election date due to an unforeseen emergency."). The State would be hard-

[12] Florida law defines "emergency" as "any occurrence, or threat thereof, whether accidental, natural, or caused by human beings, in war or in peace, that results or may result in substantial injury or harm to the population or substantial damage to or loss of property to the extent that it will prohibit an election officer's ability to conduct a safe and orderly election." *Id.* § 101.732(3).

pressed to explain to voters why the recount process would be allowed to run its course in the event of some unavoidable delays but not others.

### C. Absent an Injunction, Plaintiffs and Florida Voters Will Suffer Irreparable Harm

As set out above, Plaintiffs have a strong likelihood of success on the merits of their claims. The remaining relevant factors also cut sharply in Plaintiffs' favor.

Irreparable harm will ensue to eligible Florida voters, including Plaintiffs' members and constituencies, as well as to Plaintiffs themselves, in the absence of emergency and temporary injunctive relief.

First, absent injunctive relief, some eligible Florida voters, including Plaintiffs' supporters and members, will be disenfranchised unless the recount process is completed in each and every county. These voters cast votes that, to date, have not been included in the count. Most notably, this includes voters whose ballots have been improperly treated as "overvotes" or "undervotes" by machine technology—due to the inevitable error rate of such equipment and the fact that only a human reviewer can make more difficult voter intent determinations. Leaving the votes of these voters uncounted because they happen to reside in a county that cannot complete the machine and/or manual recount by the prescribed deadline would add injury to insult. Courts have long recognized that an abridgment to the voters' constitutional right to vote is

"irreparable harm . . . and no further showing of injury need be made." *Touchston v. McDermott*, 234 F.3d 1133, 1158-59 (11th Cir. 2000); *see also OFA*, 697 F.3d at 436 (abridgement of right to vote constitutes irreparable harm); *Council of Alt. Political Parties v. Hooks*, 121 F.3d 876 (3d Cir. 1997) (same); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (same).

Second, irreparable harm will ensue to Plaintiffs because of the well-recognized principle that the unlawful disenfranchisement of eligible voters who support them causes the candidate injury as well. *See Hunter*, 635 F.3d at 244 (finding irreparable harm to the candidate because "the disputed ballots matter to the outcome of the election," and "[t]he candidate who ultimately loses the election will suffer an irreparable and substantial harm").

### D. The Balance of Hardships Weighs in Favor of an Injunction

The balance of hardships in this case weighs in favor of granting the emergency and temporary injunctive relief Plaintiffs seek. As discussed, some of Plaintiffs' supporters and members, as well as other eligible Florida voters, will be irreparably harmed in the absence of such relief by being disenfranchised.

The impact to the State, meanwhile, would be so slight as to be unnoticeable. Local canvassing boards are already required to recount every ballot by machine or manually upon order of the Secretary of State. Plaintiffs

seek nothing more than for adequate time to be provided to the counties to complete the recount work mandated by Florida law.

The mere fact that the November 18 certification date would be delayed would cause no injury to the State. The U.S. Senate seats new senators for the next term on or about January 3. *See* 2 U.S.C. § 1. Thus, so long as the recount process is completed and the results certified by January, there is no impact on Florida's representation in the Senate. As noted above, numerous states have later deadlines for completing recounts—or no deadlines at all.

Meanwhile, to the extent that the State claims some administrative inconvenience in pushing back the applicable deadlines, any such administrative concern pales before—and must give way to—protecting the right to vote. *See Fla. Democratic Party*, 215 F. Supp. 3d at 1258 (holding that "the balance of the hardships favors Plaintiff," as "it would be nonsensical to prioritize [administrative] deadlines over the right to vote"); *see also Taylor*, 419 U.S. at 535 (concluding that "administrative convenience" cannot justify the deprivation of a constitutional right). Thus, the balance of the hardships weighs in favor of granting the relief Plaintiffs seek.

### E. An Injunction Is in The Public Interest

Finally, the relief that Plaintiffs seek is in the public interest because it will allow eligible Florida voters to exercise their fundamental right to vote. The

Eleventh Circuit, along with other courts, has held that the public has a paramount interest in elections in which every eligible resident can cast an effective vote. *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005); *see also LOWV*, 769 F.3d at 248 ("The public has a 'strong interest in exercising the fundamental political right to vote.'") (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)); *OFA*, 697 F.3d at 437 ("The public interest . . . favors permitting as many qualified voters to vote as possible."); *United States v. Classic*, 313 U.S. 299, 315 (1941) (the Constitution guarantees the right of voters "to cast their ballots and have them counted").

Plaintiffs submit that the public interest weighs all the more heavily in favor of Plaintiffs' request in the current political climate. As explained above, Florida once more finds the eyes of the nation scrutinizing its election system. In response, there are two available courses of action. The first choice is the status quo—the chaos caused by a manual recount being completed in some but not all counties. The second choice is to count all votes under Florida law, see which candidate has the most votes, and thus prioritize respecting the will of the electorate over arbitrary administrative deadlines. That choice is no choice at all.

The public interest would be best served by granting the relief that Plaintiffs request.

## CONCLUSION

For the reasons set out above, the Court should grant Plaintiffs' motion. A proposed order is attached.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(F), I HEREBY CERTIFY that the enclosed Memorandum of Law of Plaintiffs contains approximately 6,069 words, which is fewer than the total words permitted by the rules of court. Counsel relies on the word count of the computer program used to prepare this memorandum.

Dated: November 13, 2018

Respectfully submitted,

/s/

JENNIFER S. BLOHM
Florida Bar No. 0106290
Email: jblohm@meyerbrookslaw.com
RONALD G. MEYER
Florida Bar No. 0148248
Email: rmeyer@meyerbrookslaw.com
MEYER, BROOKS, DEMMA AND BLOHM, P.A.
131 North Gadsden Street
Post Office Box 1547
Tallahassee, FL 32302-1547
Telephone: (850) 878-5212
Facsimile: (850) 656-6750

Marc E. Elias
Email: MElias@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211

Counsel for Plaintiffs